The appellant was convicted of burglary in the third degree, in violation of § 13A-7-7, Code of Alabama 1975. He was sentenced to 25 years' imprisonment, was fined $1,000, and was ordered to pay $50 to the Victims' Compensation Fund.
The evidence presented by the State tended to show the following. Gayle Merrill arrived at her husband's dental office on March 23, 1991, whereupon she discovered that a window had been broken and that the office had been burglarized. She testified that empty boxes, previously collected in anticipation of the relocation of her husband's office, had been strewn everywhere. Merrill testified that vials of drugs, literature on Schedule IV drugs, "a bloody rag," syringes, and alcohol wipes saturated with blood had been scattered throughout the office and she testified that, in one room in particular, she observed a Physicians Desk Reference book lying open on the floor. Merrill testified that the drugs Brevital, Demoral, Valium, Seconal, and one additional drug, the name of which she could not remember, had been taken during the burglary. She testified that she immediately notified the Dothan Police Department, which dispatched an officer to the scene. Merrill testified that, after the officer surveyed the scene, he told Merrill and her husband that they could clean up the office. Merrill testified that while they were cleaning up, her husband discovered a box of alcohol swabs with what appeared to be a bloody fingerprint on it. Merrill testified that, in accordance with police instructions, that box was placed in a bag and was given to Sergeant John Givens of the Dothan Police Department the following Monday.
Sergeant Givens testified that he mailed the bag containing the box to the Alabama Bureau of Investigation. He testified that because he had remembered that the appellant had pleaded guilty seven years earlier to a burglary of another doctor's office in Houston County, he asked Mary Prevos, a certified latent fingerprint examiner, to compare the fingerprints found on the box with the appellant's fingerprint card, which was on file with Alabama Department of Corrections. He testified, over defense counsel's objection, that he specifically asked for this comparison because the earlier burglary involved Valium, Seconal, and Demoral and because, based on his 2 1/2 years experience in the narcotics division of the Dothan Police Department, he considered the drugs taken in both burglaries to be atypical of those usually involved in his drug investigations.
Prevos testified that she compared the bloody fingerprint on the box of swabs to those on the appellant's fingerprint card and determined that there was a match.
The appellant exercised his constitutional right against self-incrimination by electing not to testify and he did not present any witnesses in his defense.
 I
The appellant contends that the trial court committed error in allowing into evidence testimony concerning a prior conviction for burglary. More particularly, the appellant contends that evidence of the prior conviction does not fit within any exception to the general *Page 1136 
exclusionary rule regarding the admissibility of prior convictions.
The appellant filed a motion in limine to restrain the prosecution from mentioning the appellant's prior conviction. The record indicates that the trial court conducted a hearing concerning the appellant's motion. The appellant informed the trial court that he would not be testifying and the trial court granted the motion as it related "to his credibility as a witness." However, at trial the prosecutor argued that the evidence was admissible for other purposes. Therefore, a second hearing was held outside the presence of the jury. The following transpired during that hearing:
 "[PROSECUTOR]: Judge, just by way of an offer of proof, basically what the case is: Dr. Merrill's office was broken into and several drugs were taken, including Valium, Demoral, Brevital, and Sodium Seconal. There was some, a box of swabs, I believe, and an empty box of Sodium Seconal on one of the boxes, I think it was the swabs, I am not positive about that. But, on the box of swabs was a bloody fingerprint.
"THE COURT: Okay.
 "[PROSECUTOR]: John Givens was assigned to the case a day or so after the actual burglary occurred. When he went to the scene to investigate and recover the boxes, including the one with the fingerprint on it —
"THE COURT: Okay.
 "[PROSECUTOR]: — That was really all he had to go on. Now, at that point, he knew the Defendant, David Carsa Howell, and based on his knowledge of him and his history, he sent the fingerprint off to Mary Etta Prevos at the ABI and asked that the print be compared to David Carsa Howell and David Carsa Howell alone. His fingerprints were on file. Mary Etta Prevos compared them and it was a hit. It was his fingerprint, according to Mary Etta Prevos. Now, as a way of background, I would say that the Defendant does have priors. I believe he has about six prior felony convictions. Among them includes several burglaries and —
 "[DEFENSE COUNSEL]: How many burglaries? Two, I think, or one.
 "[PROSECUTOR]: No. I think it is three. One at the Immediate Care Center where he broke in. And, taken in that was some Tylenol No. 3, hypodermic needles and other items. He was caught inside that building. Also, the Southeast Alabama Medical Center, he pled guilty to this; he broke into — it was not known if anything was missing, but he was seen near the drug lab where the drugs are kept. Someone recognized him from having seen him there. I believe he might have worked there in the past in that case, as an orderly, I believe. Also, his wife was a nurse at the hospital, as well. Also, Judge, the third one, if I am not mistaken, is Dr. Borland's office was broken into. And, he pled guilty to this, as well. Taken in that was Valium, Demoral, and Sodium Seconal. John Givens worked that case. And, the way they solved that case is the Defendant had a wreck and . . . he was taken to the hospital and X-rayed and through the X-rays, they observed vials on his person and recovered these vials and put it together and ended up charging him with the break-in at the Medical Center as well as Dr. Borland's office stemming from that. John Givens knew all these things when he investigated this burglary. Based on that, when he found out what was missing and what had occurred, he gave it a shot, basically, with this Defendant's name. This is the only person that he tried to compare them to. As he stated to me, . . . I think he said three names popped in his head — and one was deceased — as . . . possible suspect[s]. But, he only went forward with this one. And again, you know that the fingerprint was matched. Now, I haven't decided how deep I plan to get into this. But, I think I have the right to have it explained by the witnesses as to the reason John Givens only compared one fingerprint and why he compared David Carsa Howell to that fingerprint or had it compared.
"THE COURT: [Defense Counsel]?
 "[DEFENSE COUNSEL]: All right. It's my understanding that these [burglaries] occurred in a short time span in '83?
"[PROSECUTOR]: '84 and '85. *Page 1137 
"[DEFENSE COUNSEL]: When were the convictions?
 "[PROSECUTOR]: He was convicted, he pled guilty in July of '85 and got 15 years, at that time.
". . . .
 "[DEFENSE COUNSEL]: So, we have got at least around an eight-year time span. It is my understanding that the Defendant was released from prison in 1989 and this alleged offense was almost two years later. And, the general rule is you don't convict on prior convictions for the offense charged. That is not substantive proof that he did that. That is a general rule and there are some exceptions. But, some of the important points of the exception would be generally that you can't get in acts which were, unless they were repeatedly done up to a comparatively recent period and were all apparently inspired by one person. In other words, two years went on that he, apparently, didn't commit any offenses. So, the prejudicial effect, in my opinion as his lawyer, would far outweigh the probative effect that this evidence would do in this case. In other words, if there is a burglary of any doctors in Dothan, I guess, you know, if we go on that type of proof, we can pick up David every time, if we are going to allow that as probative evidence.
 "[PROSECUTOR]: Of course, Judge, if you'll look in McElroy's [Alabama Evidence] where he talks about remoteness in this area, I believe it is § 69.02(6). The only time frame that the Supreme Court or any appeals court apparently has held as being too remote, is 10 years. Other than that, I believe they pretty much leave it up to the trial court. You know, identity is one of the exceptions to the exclusionary rule when identity is an issue. Also again, I'm not sure how deep I will get into that. Until they challenge identity, I don't know that I can bring out the facts of the other cases. But, prior to that, I think I have the right to have John Givens sit up here and testify to more than I had a fingerprint and told them to compare it to David Carsa Howell and leave it at that. I think the reason he did things are relevant. He didn't do it on just a whim. I think I have the right to let the Jury hear what the reason for his doing that was.
". . . .
 "[DEFENSE COUNSEL]: The 10-year rule is not an absolute rule.
". . .
 "[DEFENSE COUNSEL]: It just said that was too remote. It said that eight years is too remote. . . .
 "[PROSECUTOR]: Judge, it points out that he said eight years is too remote, but I would state to the Court again that at least four of those eight years were spent in the penitentiary for committing the same type offenses.
 "THE COURT: Well, do I understand from your proffer, [Prosecutor], that the allegedly stolen medications in this case were the same as the ones taken from Dr. Borland?
"[PROSECUTOR]: Yes, sir.
 "THE COURT: At the very least, I find that goes to common plan, motive, scheme or design. . . .
". . . .
 "THE COURT: I think it is admissible for the purpose I have just stated and for showing Officer Givens's reason for asking for a comparison of this Defendant's fingerprints with the fingerprints taken at the scene of the Merrill burglary. To that extent, I deny the motion in limine and will allow the State to provide, with proof, as to that incident for the purposes I have stated.
". . . .
 "THE COURT: . . . . My ruling is, at this point, the State may proceed with eliciting testimony concerning the Borland matter from Officer Givens to show that he had a reasonable basis for seeking a print comparison. And secondly, for the purpose of showing substantively common plan, motive, scheme or design as a nexus between the two proportions [sic]. But I am not, at this point, allowing [it], unless something should happen beyond that to make any additional convictions admissible. But at any rate, I am not, at this point, allowing it unless something should happen beyond it. *Page 1138 
But, at any rate, you have your objection on the record."
Thereafter, based on the trial court's ruling, defense counsel reserved the right to call the appellant to testify at trial.
The appellant bases his argument that evidence of the prior conviction was inadmissible on two grounds: because the prior conviction, which occurred seven years before the trial of this case, was too remote, and because evidence of the prior conviction did not fit in any exception to the exclusionary rule.
 " 'Ordinarily, remoteness of time affects the weight and probative value of evidence rather than its admissibility. It rests largely in the enlightened discretion of the court whether or not such proof will be allowed. Remoteness has regard also to factors and considerations other than mere lapse of time. It results therefore that it is practically impossible and not at all accurate to attempt to state a fixed rule or standard with particular reference to the time element. Of course, it can be said with certainty that the tendered evidence must not be so remote in point of time as to be without causal connection or logical relation to the main fact.'
 "Remoteness with respect to the admissibility of evidence is a relative idea and varies in its application according to the facts of each case."
Palmer v. State, 401 So.2d 266, 269 (Ala.Cr.App. 1981), quotingSmitherman v. State, 33 Ala. App. 316, 318, 33 So.2d 396 (1948). See also J.D.S. v. State, 587 So.2d 1249 (Ala.Cr.App. 1991);Brown v. State, 605 So.2d 1242 (Ala.Cr.App. 1992) (admission of evidence of collateral acts more than eight years old upheld against arguments of remoteness.)
The decision to allow evidence of prior convictions ordinarily rests within the sound discretion of the trial judge. Nicks v. State, 521 So.2d 1018 (Ala.Cr.App. 1987), affirmed, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241,108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). In this case, the prior conviction was not so remote as to render it, as a matter of law, inadmissible, especially in light of the fact that, for four of the seven years, the appellant was in prison serving the sentence for this earlier offense.
The general rule excluding evidence of prior convictions of a criminal defendant is stated in C. Gamble, McElroy's AlabamaEvidence § 69.01(1) (4th ed. 1991) (footnotes omitted):
 "On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which presents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. This rule is generally applicable whether the other crime was committed before or after the one for which the defendant is presently being tried.
 "This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.
 "The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such as are offered to show the defendant's bad character. If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible."
Therefore, evidence of collateral offenses of a defendant may be admissible if these offenses have some relevance to the charged offense other than to show the defendant's proclivity to commit the crime with which he is charged or to prove the defendant's guilt through his bad character. Allen v. State,380 So.2d 313 (Ala.Cr.App. 1979), *Page 1139 
cert. denied, 380 So.2d 341 (Ala.), cert. denied, 449 U.S. 842,101 S.Ct. 121, 66 L.Ed.2d 49 (1980).
Many Alabama cases have noted the following exceptions to the general exclusionary rule:
 " '(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.' "
Nicks v. State, 521 So.2d at 1026, quoting Nelson v. State,511 So.2d 225, 233 (Ala.Cr.App. 1986), affirmed, 511 So.2d 248
(Ala. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755,100 L.Ed.2d 217 (1988). See also Giddens v. State, 565 So.2d 1277
(Ala.Cr.App. 1990); Meadows v. State, 584 So.2d 953
(Ala.Cr.App. 1991). However, these exceptions are not applicable unless there "is a question of the identity of the defendant as the perpetrator of the alleged crime or where there is a question of intent, motive, physical capacity, or knowledge." Ex parte Darby, 516 So.2d 786, 788-89 (Ala. 1987). Here, the defendant's identity was placed into issue when he pleaded not guilty to the burglary charge and when the State was unable to positively identify the defendant as the perpetrator.
In Williams v. State, 350 So.2d 708, 709 (Ala. 1977), the Alabama Supreme Court held that a defendant's plea of not guilty, "where the defendant offers no other defense," and "where the witness made a positive identification based upon her observation of defendant [during the prior offense forming the basis of the prior conviction]," does not place the defendant's identity at issue so as to justify the admission of the prior offense. In Williams v. State, the Alabama Supreme Court held as erroneous the trial court's finding that the State "had a lawful right to establish the identity of defendant as the robbery culprit by competent evidence, even though redundant. The fact that [the eyewitness] saw him a week later, when he again robbed her, was admissible even though she was positive of the first identification." Id. In the present case, the record is clear that the appellant's bloody fingerprint established the only evidence that he had committed the offense or had even been present in the dentist's office. See Ex parte Williams, 468 So.2d 99 (Ala. 1985) (the fact that the accused's fingerprints were found on a box of film moved during a burglary did not, without more, establish that the accused committed the burglary). Thus, the issue of identity having been placed in issue by the appellant's plea, was not clearly established by other evidence, so that the admission of these prior offenses would not have been "redundant." Cf.Mothershed v. State, 596 So.2d 47 (Ala.Cr.App. 1991) (identity was never placed in issue were an appellant never alleged that someone else was the perpetrator of the crime, but merely denied that the acts ever occurred.) Cf. also Dozier v. State,596 So.2d 49 (Ala.Cr.App. 1991) (identity was not at issue, and therefore the exception for plan, scheme or system, was not applicable, because there was no dispute as to the appellant's identity; in that case an undercover ABC agent was able to positively identify the defendant as the man who had sold him cocaine on two occasions, and the defendant presented no evidence to the contrary).
Because in this case the only evidence the State presented from which the jury could infer that the appellant had committed the offenses was a bloody fingerprint found on a box at the scene of the offense, the question of identity was clearly at issue. Thus, the plan, scheme, or system exception, which is essentially coextensive with the identity exception,Ex parte Darby, 516 So.2d 786, 789 (Ala. 1987), might apply.
Moreover, during the cross-examination of Gayle Merrill, defense counsel asked if the appellant might have been in the office as a patient and further asked if she could positively state that the appellant had never been inside the building in which the dental office was located. Defense counsel then questioned her as to other patients or employees who might have had access to the drugs kept in the office. Thus, through this line of *Page 1140 
questioning, the appellant raised the issue of identity.
Regarding the exception of plan, design, scheme, or systemMcElroy's states:
 "Evidence of the accused's commission of another crime is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime were committed in keeping with or pursuant to a single plan, design, scheme or system. This rule is applicable whether such plan, design, scheme or system is narrow and specific in scope or is measurably broad and general in scope."
McElroy's § 69.01(6) (footnote omitted). Regarding the identity exception, McElroy's states:
 "All evidence tending to prove a person's guilty of the now-charged crime may be said to identify him as the guilty person. However, the identity exception to the general exclusionary rule is much more specific in that it contemplates the situation where the now-charged crime was committed in a novel and peculiar manner and the state is allowed to show that the accused has committed other similar offenses, in the same novel and peculiar manner, in order to show him the perpetrator of the now-charged crime.
 "The identity exception to the general exclusionary rule only becomes applicable when the identity of the person who committed the now-charged crime is in issue.
. . . . .
 "Within this identity exception are those decisions holding that, if the evidence indicates that the same person committed both the now-charged crime and a prior crime, proof may be made of traces pointing to the accused as the one who committed the prior crime."
McElroy's § 69.01(8) (footnotes omitted).
Almost invariably, the identity and common plan, design, or scheme exceptions are discussed together in cases. In fact, the Alabama Supreme Court has stated that the common plan, design, or scheme exception to the general exclusionary rule is "essentially co-extensive with the identity exception." Exparte Darby, 516 So.2d 786, 789 (Ala. 1987). See also 2 Wigmoreon Evidence (Chadbourn rev. 1979), § 304.
 " 'Evidence of the accused's commission of another crime is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime were committed in keeping with or pursuant to a single plan, design, scheme, or system, whether narrow or broad in scope.' Nicks v. State, 521 So.2d 1018, 1027 (Ala.Cr.App. 1987), affirmed, 521 So.2d 1035 (Ala. 1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), citing C. Gamble, McElroy's Alabama Evidence, § 69.01(6) (3rd ed. 1977)."
Harvey v. State, 579 So.2d 22, 26 (Ala.Cr.App. 1990).
The threshold requirement for the admissibility of collateral acts under these exceptions is that there must be something novel or peculiar about the collateral acts that tends to identify the defendant as the perpetrator of the present crime.Nicks v. State, supra.
 "Under the identity exception to the general rule prohibiting the admission of . . . collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are 'signature crimes' having the accused's mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person."
Bighames v. State, 440 So.2d 1231, 1233 (Ala.Cr.App. 1983).
In Brewer v. State, 440 So.2d 1155 (Ala.Cr.App. 1983), this court stated:
 "One of the common threads running through all of the treatise-writers' explanations of the signature exception is that a strict test of similarity between the charged and non-charged offenses should be applied. McCormick observes the following:
 " '[T]he courts are stricter in applying their standards of relevancy when the ultimate purpose of the state is to prove identity, or the doing by the accused of *Page 1141 
the criminal act charged than they are when the evidence is offered on the ultimate issue of knowledge, intent or other state of mind.'
 "McCormick on Evidence, § 190 at 452 (E. Cleary 2d ed. 1972). Wigmore explains the theory as follows:
 " '§ 304. Theory of evidencing design or system. When the very doing of the act charged is still to be proved, one of the evidential facts receivable is the person's design or plan to do it. . . . This in turn may be evidenced by conduct of sundry sorts . . . as well as by direct assertions of the design. . . . But where the conduct offered consists merely in the doing of other similar acts, it is obvious that something more is required than that mere similarity, which suffices for evidencing intent. . . . The object here is not merely to negative an innocent intent at the time of the act charged, but to prove a preexisting design, system, plan, or scheme, directed [towards] to the doing of the act. In the former case (of intent) the attempt is merely to negative the innocent state of mind at the time of the act charged; in the present case the effort is to establish a definite prior design or system which included the doing of the act charged as a part of its consummation. In the former case, the result is to give a complexion to a conceded act, and ends with that; in the present case, the result is to show (by probability) the doing of the act designed.
 " 'The added element, then, must be, not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'
" '. . . .
 " 'It will be seen that the difference between requiring similarity, for acts negativing innocent intent, and requiring common features indicating common design, for acts showing design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity. This is another reason why the precedents are so difficult to reconcile; for the courts have not always perceived that there are in truth these two distinct purposes and therefore two distinct tests for such evidence.
 " 'Nevertheless the distinction is a real one. It is to be seen in concrete illustrations, even though in abstract definition it is not easy to formulate. The clue to the difference is best gained by remembering that in the one class of cases the act charged is assumed as done, and the mind asks only for something that will negative innocent intent; and the mere prior occurrence of an act similar in its gross features — i.e., the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer — may suffice for that purpose. But where the very act is the object of proof, and is desired to be inferred from a plan or system, the combination of common features that will suggest a common plan as their explanation involves so much higher a grade of similarity as to constitute a substantially new and distinct test.'
 "2 Wigmore on Evidence § 304 at 249-50, 250-51 (Chadbourn rev. 1979) (emphasis in [Wigmore])."
Id. at 1161-62.
In this case, the evidence concerned a prior offense by the appellant that was not merely "similar" to the instant offense, so that this evidence served merely to negative in innocent intent, but rather so similar as to indicate a general plan to burglarize offices containing pharmaceuticals to acquire particular sorts of "injectable drugs." The definition of "pharmacy" in the "Pharmacy Robbery Act of 1982," §13A-8-51(1), Code of Alabama 1975 (clearly the legislature envisioned the common features or traits of these drug storage facilities, such as the doctors' offices and pharmaceutical centers involved in this case) as "[a]ny building, warehouse, physician's office, hospital, pharmaceutical house or other structure used in whole or in part for the sale, storage and/or dispensing *Page 1142 
of any controlled substance." Moreover, the State presented evidence that the particular type of drugs involved in the charged offense and the collateral offense, i.e., Seconal, Valium, Demoral, and Brevital, are all "injectable drugs," and are not the usual drugs involved in narcotics cases. The investigating officer in this case, who had worked in the narcotics unit for two and one-half years, testified that when he was informed of the specific drugs that were missing, he thought of the appellant as a suspect because of his involvement in the previous case. Because of the "novel or peculiar" circumstances of these offenses to the Houston County area, the investigating officer had the bloody fingerprint compared to the known fingerprints of the appellant. Thus, the appellant's prior conviction was properly admitted pursuant to the common plan, scheme, or design exception to the exclusionary rule.
 II
The appellant argues that the State failed to establish a proper chain of custody of the box on which the bloody fingerprint was found. Specifically, he argues that a break in the chain of custody occurred between the time that the fingerprint was found until the investigating officer took custody of the box two days later. However, the State provided testimony of the dentist's wife, who worked in the office which was burglarized, that she had placed the box with the bloody fingerprint on it in a bag, which she subsequently gave to the investigating officer. She further testified that neither she nor her husband touched the fingerprint. The investigating officer testified that he was given the bag by the dentist's wife. He testified that he had sealed the items in the envelope, had written his initials on the envelope and had mailed it to the ABI. A latent print examiner with the ABI testified that she had received the sealed envelope from the investigating officer. This evidence was sufficient to prove to a reasonable probability that the fingerprint examined was in the same condition as, and not substantially different from, its condition at the beginning of the chain. Ex parte Williams,505 So.2d 1254 (Ala. 1987). Thus, because the State established to a reasonable probability that there had been no tampering with the evidence, Suttle v. State, 565 So.2d 1197, 1199
(Ala.Cr.App. 1990), the trial court properly overruled the appellant's objection to the admission of this evidence.
 III
The appellant argues that the State failed to present sufficient evidence to support his conviction. However, the record indicates that the State established sufficient circumstantial evidence to present a jury question concerning the appellant's commission of the offense of burglary in the third degree. McConnell v. State, 429 So.2d 662, 665
(Ala.Cr.App. 1983). The State presented evidence that the dentist's office had been left in disarray, that boxes and vials were "strewn around," and a number of the boxes had been emptied. A State's witness testified that a window had been broken and that certain vials of drugs were misplaced. She testified that, in the room where the drugs were kept, there was a "bloody rag," a syringe, alcohol wipes that had apparently been used, and Schedule IV literature. The State also presented evidence that the appellant's bloody fingerprint was found at the scene, and that he was not a patient. Based on all the evidence, we conclude that a jury question as to the appellant's guilt was presented.
AFFIRMED.
All Judges concur.